J-S10022-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                  :           PENNSYLVANIA
                                  :
           v.                        :
                                  :
                                  :
MATTHEW GIBSON                  :
                                  :
              Appellant          :       No. 602 MDA 2021

Appeal from the Judgment of Sentence Entered March 23, 2021
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0005146-2019

BEFORE:    MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:         **FILED: AUGUST 29, 2022**

      Matthew Gibson appeals the judgment of sentence entered following his conviction for aggravated assault.[1] Gibson challenges the sufficiency of the evidence, the admission of testimony, and the conditions of his probation. We affirm in part and vacate in part.

      The trial court aptly summarized the evidence at Gibson's trial as follows:

> During the early morning hours of July 7, 2019, a surveillance camera at the Alert Club in Lancaster, Pennsylvania captured an interaction between Defendant Matthew Gibson ("[Gibson]") and John Ackerman ("[Ackerman]"). (Notes of Trial Testimony, Nov. 16, 2020, Com. Ex 1 [hereinafter "Alert Club Surveillance"]). (<u>Id.</u> at 0:34). [Gibson] initiates a conversation with Mr. Ackerman

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2702(a)(1).

and, as the two men continue speaking, [Gibson] appears increasingly agitated. (Id. at 0:45-0:53). The footage shows [Gibson] push away Scott Groff ("Mr. Groff"), a friend of Mr. Ackerman, as Mr. Groff attempts to intercede in the conversation. (Id. at 0:54-1:06; Notes of Trial Testimony, Nov. 16, 2020, 105:8-12 [hereinafter "N.T."]).

Mr. Ackerman appears to express confusion as [Gibson] continues speaking (Alert Club Surveillance at 0:56-1:05). Approximately one minute after the conversation started, the bartender approaches and appears to attempt to diffuse the situation. (Id. at 1:45). Mr. Ackerman, who is positioned with his back to the bar, turns to look at the bartender. (Id.) [Gibson] continues speaking and Mr. Ackerman turns his head back toward [Gibson]. (Id. at 1:47). Then, as Mr. Ackerman turns back toward the bartender, the camera clearly captures [Gibson] unexpectantly punch Mr. Ackerman in the head. (Id. at 1:56). The single, unanticipated blow causes Mr. Ackerman to appear to go immediately limp as his head takes the impact. (Id.) Mr. Ackerman losses consciousness and falls backward onto floor. (Id. at 1:56, N.T., 175:7-15). [Gibson] – who is visibly larger than Mr. Ackerman – appears to make at least two more swinging motions before Mr. Groff physically restrains [Gibson] to prevent him from advancing toward Mr. Ackerman. (Alert Club Surveillance at 1:58-2:57). Mr. Ackerman remains on the floor for the remaining two minutes of the security footage. (Id. at 1:56-3:48).

Mr. Ackerman was driven by ambulance to the hospital where he spent four days in the neuro trauma unit. (N.T. 84:18-20). As a result of the punch, Mr. Ackerman lost two front teeth, underwent three jaw surgeries that included placement of a cage and a plate, and had his jaw wired shut for eight weeks. (N.T. 61:6-62:7). [Gibson] was subsequently charged with Aggravated Assault and a jury trial was held on November 16 and 17, 2021.

Mr. Ackerman testified at trial and recalled that while he was sitting at the bar with Ms. Hernandez, [Gibson] "walked up and kind of . . . got in [his] face," but was unable to remember anything that [Gibson] said during the conversation and could not recall [Gibson] punching him in the face – his next memory was waking up in the hospital. (N.T. 56:13-57:5). Mr. Ackerman testified that, since being

discharged from the hospital, part of his treatment has included undergoing regular MRIs. (N.T. 62:12-25). Additionally, Mr. Ackerman testified that since [Gibson] punched him, he has had ongoing, persistent short-term memory loss and frequently experiences seizures despite taking seizure medication twice a day. (N.T. 60:10-61:4). Although Mr. Ackerman was not employed at the time of the incident, he testified that the seizures he experiences have prevent him from getting a job and that he has trouble going out in public due to anxiety and panic attacks. (N.T. 64:25). Ms. Hernandez testified at trial and observed that after [Gibson] punched Mr. Ackerman, Mr. Ackerman changed in "a really bad way," including being unable to sit in public places with his back facing any doors and jumping when he hears loud noises. (N.T. 85:20-86:7).

Scott Groff ("Mr. Groff") also testified at trial. In addition to testifying about what he observed the night of the incident, Mr. Groff testified to an encounter that he had with [Gibson] at another club several months later. Although he could not recall [Gibson's] exact words, Mr. Groff testified that when [Gibson] saw him, [Gibson] threatened him by saying something like "I know who you are, too, and I should get you too." (N.T. 115:18-25).

1925(a) Op., filed 7/14/21, at 1-3.

The jury returned a verdict of guilty, and the trial court imposed a sentence of six and one half to 13 years' incarceration. The court also ordered Gibson to have no contact with the victim. Gibson filed a post-sentence motion which the trial court denied. This timely appeal followed.

Gibson raises the following issues:

I. Did the trial court err in admitting Scott Groff's testimony regarding an encounter between Mr. Groff and Mr. Gibson which occurred months after the charged assault, where this testimony was not relevant to show Mr. Gibson's state of mind at the time he punched John Ackerman on July 27, 2019?

- 3 -

II. Was the evidence insufficient to prove beyond a reasonable doubt that Mr. Gibson was at least criminally reckless with regard to causing serious bodily injury to John Ackerman, where there was no evidence that Mr. Gibson's actions were so reckless that a life-threatening injury was almost certain to occur?

III. Did the trial court err in ordering, as a condition of Mr. Gibson's state sentence, that he could have no contact with Mr. Ackerman, where the court had no jurisdiction to impose this condition, as the Pennsylvania Department of Corrections has exclusive authority over state prison conditions, and the Pennsylvania Department of Probation and Parole has exclusive authority over state parole conditions?

Gibson's Br. at 7 (answers omitted).

Gibson argues that the trial court erred in admitting part of the testimony of Scott Groff. Gibson challenges the following portion of Groff's testimony, which references Gibson's statements to Groff a few months after the assault:

Q [Commonwealth]: Without going into detail, can you state or tell the jury where you saw [Gibson]?

A: I saw him a couple months later at another club called the Eagles Club.

Q: And during that interaction, did he make any statements to you?

A: At the end of the night when he was being removed from that club, yes.

Q: And what did he tell you?

A: He said, I know who you are. He was like, I'll come get you. . . .

There was an altercation between him and another –

[Defense counsel]: Objection, Your Honor.

- 4 -

> THE COURT: Sustained.
>
> BY [Commonwealth]:Q: Without going into the underlying issues, or what happened prior to the statements being made, what exactly did he say to you?
>
> A: He just kind of threatened me that I know who you are, too, and I should get you, too, something to that effect. I don't know exactly what the words were.

N.T., 11/16/20, at 115.

Gibson argues that the court erred in admitting this testimony over his objection. He maintains that his comment to Groff was unrelated to the victim, was not relevant to his state of mind at the time of the assault, and only showed "his character and propensity," in violation of the Rules of Evidence. Gibson's Br. at 20. He also alleges that the error was not harmless because Groff's testimony "encouraged the jury to consider [it] as evidence of [his] bad character and propensity to cause harm. ***Id.*** at 21.

The admission of evidence is within the discretion of the trial court. ***See Commonwealth v. Williams***, 274 A.3d 722, 729 (Pa.Super. 2022). Absent an abuse of discretion, we defer to the court's admittance of evidence. ***See id.*** "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such a lack of support so as to be clearly erroneous." ***Id.*(citation omitted).** Evidence is admissible where it is relevant, meaning that it has any tendency to make a material fact "more or less probable." ***Commonwealth v. DiStefano***, 782 A.2d 574, 583 (Pa.Super. 2001); Pa.R.E. 401. However,

regardless of its logical relevancy, evidence of a defendant's bad acts admitted to show propensity is inadmissible. *See Commonwealth v. Cox*, 115 A.3d 333, 337 (Pa.Super. 2015); Pa.R.E. 404(b).

The Commonwealth responds that any error in admitting Groff's testimony is harmless "due to the overwhelming evidence that [Gibson] acted with reckless disregard for the value of human life." Commonwealth's Br. at 10. Harmless error occurs where "the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Stafford*, 749 A.2d 489, 497 (Pa.Super. 2000) (citation omitted). The Commonwealth bears the burden of establishing harmless error. *See Commonwealth v. Chmiel*, 889 A.2d 501, 528 (Pa. 2005).

Here, the trial court concluded that the evidence was admissible to show Gibson's state of mind when he punched the victim, made it more probable that Gibson intended to cause serious bodily harm to the victim, and was not prejudicial because Gibson's assault of the victim was captured on video. Citing *Commonwealth v. Burton*, 2 A.3d 598 (Pa.Super. 2010)(*en banc*), the court concludes that "statements made by a defendant before and after an attack" may be considered when determining the defendant's particular intent. *See* 1925(a) Op. at 6.

Gibson waived this issue by failing to object. The only objection in the quoted passage was sustained. He did not raise any objection to the second

portion of Groff's disputed testimony, in which Groff said that Gibson threatened him. A failure to raise a timely objection constitutes waiver. *See* Pa.R.A.P. 302(a); ***Commonwealth v. Bedford***, 50 A.3d 707, 714 (Pa.Super. 2012) (en banc).

Moreover, we agree that any error in this regard was harmless. There was overwhelming evidence of Gibson's intent and guilt in assaulting the victim. As seen from the video of the assault, Gibson initiated a conversation with the victim and became more aggressive throughout the conversation. Then, while the victim had his head turned towards the bartender, Gibson punched the victim one time with such force that the victim's head snapped backward, and he fell to the ground having been knocked unconscious. Based on this evidence, it is clear beyond a reasonable doubt that any error from the admittance of Groff's testimony did not contribute to the verdict in this case and any prejudicial effect was insignificant.

Gibson also claims that the evidence was insufficient as to whether he acted recklessly in causing serious bodily injury to the victim. Gibson argues that the Commonwealth presented no evidence that his actions were reckless. He alleges the evidence shows that his punch "was not entirely surprising[,]" he did not have a weapon, and his statements before and after the assault do not support a finding that he intended to cause serious bodily injury. Gibson's Br. at 24. He cites ***Commonwealth v. O'Hanlon***, 653 A.2d 616, 618 (Pa. 1995), and argues that "the recklessness must, therefore, be such that life threatening injury is essentially certain to occur." ***Id.*** Gibson admits that

"serious bodily injury unfortunately occurred" but maintains that his actions did not rise to such a level of "life-threatening injury." Gibson's Br. at 25.

We review a challenge to the sufficiency of the evidence by determining whether the evidence was sufficient to prove every element of the crime beyond a reasonable doubt. In conducting this review, we view the evidence in the light most favorable to the Commonwealth, as the verdict-winner, and make all reasonable inferences in its favor. **See Commonwealth v. Russell**, 209 A.3d 419, 426 (Pa.Super. 2019). The Commonwealth may sustain its burden by circumstantial evidence and this Court will not "re-weigh the evidence and substitute our judgment for that of the fact-finder." **Id.**

For the subsection of aggravated assault charged in this case, the Commonwealth was required to prove that Gibson "attempt[ed] to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1). If the victim in fact suffers serious bodily injury, the Commonwealth need not prove specific intent. **See Commonwealth v. Patrick**, 933 A.2d 1043, 1046 (Pa.Super. 2007) (*en banc*). The Crimes Code defines serious bodily injury as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301 (**"Serious bodily injury"**).

Since Gibson concedes that serious bodily injury occurred in this case, we address his claim that the Commonwealth did not present sufficient evidence that he acted recklessly under circumstances manifesting extreme indifference to the value of human life. We find the evidence sufficient to support such a finding. Gibson initiated the altercation with the victim. Though others tried to separate Gibson from the victim, he continued to remain face to face with the victim. It is from this distance that Gibson punched the victim with such force that the victim's head snapped back, and his body fell to the ground. Gibson then had to be restrained by others in the bar and eventually pulled out of the bar. The victim testified that the only thing he remembered about the incident was a conversation with Gibson. The next thing he could remember was waking up in the hospital.

Moreover, while Gibson claims his assault of the victim was "not that surprising," because he told the victim that he could "bitch slap you right now", a review of the video of the assault tells a different story. **See** N.T. 11/16/20, at 109; Gibson's Br. at 24. While the victim's head is turned, and his face was to the bartender, Gibson punched the victim in his head. Gibson's action disregarded any risk that punching the victim in his head while he was not looking and unable to defend himself risked serious injury to the victim. **See Burton**, 2 A.3d at 603 (affirming judgment of sentence for aggravated assault where defendant punched victim one time in head while victim was not looking, and victim was knocked unconscious). The trial court did not err in

concluding that the evidence was sufficient to sustain the conviction for aggravated assault.

Furthermore, Gibson's reliance on **O'Hanlon** is misplaced as that case is easily distinguishable. O'Hanlon was driving under the influence of alcohol, ran a red light, and hit another vehicle resulting in serious injury to an occupant of the other vehicle. **O'Hanlon**, 653 A.2d at 616. Our Supreme Court concluded that O'Hanlon's behavior did not rise to the level of intent required by the aggravated assault statute, namely, recklessness "under circumstances manifesting extreme indifference to the value of human life." **Id.** at 617. The Court concluded that bare recklessness, without evidence to support the increased degree of recklessness required for aggravated assault, was not enough. **Id.** at 618.

This case is not in the same category as **O'Hanlon**. Rather, it is more like **Burton**. There, we found sufficient evidence to support a conviction for aggravated assault where the defendant punched the victim in head once, while the victim was not looking. The victim was knocked unconscious, and afterward, the defendant said, "I got you, I got you, I told you I was going to get you" while smiling and laughing. **Burton**, 2 A.3d at 600. In this case, Gibson told the victim he could "bitch slap" him, and then punched him in the head while the victim was not looking. Gibson hit him with such force that the victim immediately fell to the ground and did not get up, having been knocked unconscious. As in **Burton**, the evidence here was sufficient to establish the *mens rea*.

- 10 -

In his final claim, Gibson argues that the court exceeded its jurisdiction by imposing a no-contact order with the victim against Gibson as a condition of his sentence. He argues that the Department of Probation and Parole ("Parole Department") will have exclusive authority over the conditions of any parole. He maintains that the portion of his sentence imposing a condition of no contact with the victim should be vacated.

A challenge to the trial court's authority to impose a particular sentence implicates the legality of the sentence. *Commonwealth v. Mears*, 972 A.2d 1210, 1211 n.1 (Pa.Super. 2009). As such, our standard of review is plenary and limited to determining whether the trial court committed legal error. *See Commonwealth v. Leverette*, 911 A.2d 998, 1002 (Pa.Super. 2006). Any portion of a sentence that is illegal must be vacated. *See id.* at 1001. "[T]he Pennsylvania Board of Probation and Parole has exclusive authority to determine parole when the offender is sentenced to a maximum term of imprisonment of two or more years." *Commonwealth v. Camps*, 772 A.2d 70, 74 (Pa.Super. 2001); *see also* 61 Pa.C.S.A. § 6132(a).

The parties agree that the court exceeded its authority by imposing a no-contact order as a condition of Gibson's sentence. The parties also do not dispute that the imposed sentence by the court, subjects Gibson to the exclusive authority of the Parole Department. We agree.

The trial court imposed a sentence of six and one half to 13 years' incarceration, without any probation tail. The court nonetheless purported to impose a condition of no contact with the victim. However, because the

maximum sentence was greater than two years, the Parole Department had exclusive jurisdiction of any eventual parole and the exclusive authority to set accompanying conditions. *See Camps*, 772 A.2d at 74. Therefore, we vacate in part the portion of the judgment of sentence that imposed a no-contact order. *See Mears*, 972 A.2d at 1212 (vacating in part judgment of sentence ordering random searches, where Parole Department had exclusive jurisdiction of the conditions of defendant's parole).

Judgment of sentence affirmed in part and vacated in part. Jurisdiction relinquished.

Judge Murray joins the memorandum.

Judge Colins files a concurring memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/29/2022